CANADA SOUTHERN RY. Co. *v.* INTERNATIONAL BRIDGE Co. and another.

*(District Court, N. D. New York.   1881.)*

1. THE INTERNATIONAL BRIDGE COMPANY—ACT OF 1870.

The act of congress passed in June, 1870, providing, among other things, that "all railway companies desiring to use the said bridge shall have and be entitled to equal rights and privileges in the passage of the same, and in the use of the machinery and fixtures thereof, and of all the approaches thereto, under and upon such terms and conditions as shall be prescribed by the district court of the United States," etc., does not confer upon such court jurisdiction over a controversy relating solely to the compensation which is due the corporation for the use of the bridge.

2. POWER TO REGULATE COMMERCE.

Where a corporation incorporated by the legislatures of Canada and New York for the purpose of building a bridge, constructs it, in part, over public navigable waters of the United States, it seems that congress, under the power conferred upon it by the constitution to regulate commerce, has the right to prescribe what compensation it shall charge for its use.

3. CONGRESS—DELEGATION OF AUTHORITY—JUDICIAL FUNCTIONS.

As the exercise of judicial functions alone is involved in determining the amount of such compensation, congress can confer the authority necessary for this purpose upon a federal court.

4. CHARTER RIGHTS—LEGISLATIVE INTERFERENCE.

As the right to charge such tolls as the judgment of its officers might warrant constituted the essential value of such company's franchise, it will not be inferred that congress intended to interfere therewith, if the language of the act is consistent with a less violent purpose.

*McMillan & Gluck,* attorneys for petitioner, with *Geo. F. Comstock, Adam Crooks, Q. C., Grover Cleveland,* and *Daniel H. McMillan,* of counsel for petitioner.

*Sprague, Milburn & Sprague,* attorneys for respondents, with *E. C. Sprague, John Bell, Q. C.,* and *John G. Milburn,* counsel for respondents.

WALLACE, D. J.   The petitioner, the Canada Southern Railway Company, has applied to this court to determine the terms and conditions upon which it may be permitted to use the bridge of the respondent, the International Bridge Company, and in this behalf to adjudge what compensation the respondent may exact for such use. The International Bridge Company is a corporation organized pursuant to concurrent legislation on the part of the State of New York and of Canada, authorizing a New York corporation and a Canadian corporation to consolidate and enjoy the franchises conferred by the legislation of the respective sovereignties.   Under these acts the corporation was authorized to build and maintain a bridge across the

Niagara river for the passage of persons on foot and in carriages, and for the passage of railway trains, and to fix and demand tolls for the use of the bridge and its approaches. No limitation upon the rate of tolls to be charged for the use of the bridge by railway trains is imposed, but the directors are empowered expressly or by implication to charge such tolls as they may deem expedient. The bridge thus authorized was to be, and as built is, partly within the territorial limits of New York and of Canada, and over navigable waters of the United States.

In June, 1870, the congress of the United States passed an act authorizing the International Bridge Company to construct and maintain the bridge, subject, however, to several conditions; of which some related to the location and place of the structure, and the supervision of the work by the secretary of war. It was further provided by that act as follows:

"All railway companies desiring to use the said bridge shall have and be entitled to equal rights and privileges in the passage of the same, and in the use of the machinery and fixtures thereof, and of all the approaches thereto, under and upon such terms and conditions as shall be prescribed by the district court of the United States for the northern district of New York, upon hearing the allegations and proofs of the parties, in case they shall not agree."

The bridge was completed in the fall of 1873, and since that time has been used by several railway companies for the passage of their trains. Since October 31, 1877, the bridge company and the Canada Southern Railway Company have been unable to agree upon the tolls which should be paid by the latter for the use of the bridge, and, relying upon the provisions of the act of congress aforesaid, the latter company has applied to this court to prescribe the terms and conditions upon which it may be entitled to use the bridge. The application of the petitioner is met by the respondent, at the threshold of the controversy, by the objection that the act of congress does not confer power upon this court to prescribe the compensation which the bridge company may charge for the use of its property; and that, if such power is intended to be conferred, the act is unconstitutional.

It is insisted that such a power could not have been contemplated, because the right to establish tolls is conferred upon the bridge company by the charters concurrently granted by Canada and the state of New York; that it would be inconsistent with considerations of courtesy towards these two sovereignties, and of respect for the vested rights of the corporators in their franchises, to confer such a power; and that if such a power were conferred, it would partake of a

legislative rather than of a judicial character, and is therefore one which congress could not delegate to this tribunal.

At an earlier stage in the controversy these objections were considered by the court, and a conclusion reached, which is now believed to have been radically wrong, upon the main question involved. The ruling then made was not intended to foreclose further discussion, and counsel have since been fully heard, and the case carefully reconsidered.

While the opinion originally expressed has been confirmed in all that relates to the constitutional right of congress to confer jurisdiction upon the court to decide what compensation the bridge company may charge the railroad companies for the use of the bridge, the reconsideration has led to the conviction that the act was not intended to, and does not, confer such jurisdiction. Assuming that congress intended to confer upon this court authority to prescribe the compensation which the bridge company might charge for the use of their property, no doubt is entertained of the constitutionality of the act. It was an inherent condition to the complete enjoyment of the grant conferred by the state of New York and the dominion of Canada upon the corporation, that congress should sanction the undertaking proposed, as congress was a necessary party to any compact which involved the cession of the sovereignty of the United States over that part of the Niagara river lying within the boundaries of the state of New York. The river is a public, navigable water, and under the power to regulate commerce, congress undoubtedly had the right to prohibit obstructions to its navigation; to declare any obstruction a public nuisance; to declare what degree or description of obstruction should be a public nuisance; to direct the mode of proceeding in the courts of the United States to remove it; and to punish any one who might erect or maintain it. *Taney* v. *Wheeling Bridge Co.* 13 How. 579. The franchises granted by the state of New York and the dominion of Canada were accepted by the bridge company, subject to the right of congress to intervene whenever its power to regulate commerce should be invoked, and to determine what should be the character and extent of its intervention. *Gilman* v. *Philadelphia*, 3 Wall. 725; *The Clinton Bridge*, 10 Wall. 454; *County of Mobile* v. *Kimball*, 102 U. S. 691.

It cannot, therefore, be maintained that the act of congress is a disturbance of any vested rights of the bridge company under the charters which it had obtained, even had it not been passed before the company commenced to build the bridge. But it was passed before

anything had been done by the bridge company towards the construction of the bridge; and it was undoubtedly passed when it was in order that the company might know in advance what terms congress would require as the condition of its sanction to the undertaking. Neither can the constitutionality of the act be successfully assailed upon the theory that the power to fix tolls is a legislative power which cannot be delegated. Concededly, congress could not delegate its legislative powers or confer authority upon this court to exercise any but judicial functions; but the act can be upheld as one which devolves the merely judicial function upon the court of determining the rights of parties when they may be brought into controversy after congress has created and defined the right. If the act provides for a determination of the terms and conditions upon which the railway companies may use the bridge in case the parties fail to agree, inasmuch as this determination is committed by the act to a judicial tribunal upon hearing the proofs and allegations of the parties, the inference is cogent that the tribunal is to proceed according to the settled principles which control judicial action; it is not to exercise an arbitrary discretion but a judicial discretion; it is to ascertain the rights of the parties by evidence, and to adjudicate upon them under the sanctions of precedent and in conformity with established rules of law. It is no less the exercise of judicial functions to prescribe a rule of future conduct, or protect the existence of a right in the future, than it is to determine whether the right has been invaded in the past. It is one of the prominent offices of courts of equity to do this. While there are intrinsic difficulties of a grave nature in dealing with such a question of fact as would require to be decided, the inquiry after all would only be as to what would be reasonable compensation to the bridge company for the use of their property.

The more difficult inquiry relates to the true interpretation of the act, and whether it confers any broader authority upon the court than that of regulating the terms and conditions to which the bridge company shall submit in enforcing the equal rights of the several railway companies to the use of the property. In view of the fact that the bridge to be built was to be not only an erection which might interfere with commerce upon a public, navigable river, but was to be a highway of commerce between the eastern and western states which might seek the shorter route through Canada, it was reasonable to expect that the protection of that commerce would find recognition at

the hands of congress; and it was not to be expected that congress would devolve the duty of that protection on any other than one of its own tribunals. Accordingly it was but reasonable that the act should require the bridge company to submit itself to the jurisdiction of a court of the United States, within whose territorial jurisdiction the bridge was to be, whenever controversies should arise concerning the rights of the railway companies, and involving the measure of protection declared by congress.

But the power to intervene, and declare what compensation the bridge company should be permitted to charge for the use of the bridge, involves the exercise of a high prerogative. The bridge company had been authorized by the legislatures of Canada and New York to charge such tolls as the judgment of its officers might warrant, and this right constituted the essential value of the franchise. It is one of which the company should not be deprived except by a clear and unambiguous declaration to that effect. The intention of congress to interfere to such a vital extent with the franchises of the corporation ought not to be and will not be inferred if the language of the act is consistent with a less violent purpose. Ordinarily it is the legislative department that prescribes the tolls which may be charged in the enjoyment of a franchise, and this is usually done by fixing a maximum beyond which the grantee cannot go. It is sometimes, however, a judicial duty to determine what are reasonable tolls. But where, as here, that question is to be resolved by determining what return shall be allowed to the bridge company upon its investment,— an investment involving peculiar risks, and wholly experimental financially,—and the court must decide without precedent or guide, or the light of usage, a duty is imposed which approaches so nearly to the exercise of an arbitrary discretion that it lies upon the very confines of judicial power.

Recurring to the language of the act, it appears that congress adopted the precise phraseology which is found in both the Canadian and New York acts of incorporation to prevent unfriendly discrimination by the bridge company between the various railway companies that might desire to use the bridge, and give the railway companies equal facilities in its use. Both the New York and Canadian acts declare that the railway companies using the bridge "shall have, and be entitled to, equal rights and privileges in the passage of said bridge, and in the use of the machinery and fixtures thereof, and of all the approaches thereto," and the act of congress adds "under and

upon such terms and conditions as shall be prescribed by the district court," etc.

It is not a reasonable inference from the adoption by congress of that part of the charter of the bridge company which created and defined the rights and privileges of the railway companies, that congress intended to reaffirm and protect the same rights and privileges, without trenching upon the charter of the bridge company; committing, however, the practical enforcement of those rights and privileges, in case of controversy, to a federal court.

Considering the phraseology of the act as though it had been originally employed by congress, it seems to be appropriate and exact to confer upon the railway companies equal rights and privileges in the physical use of the bridge, its machinery, and its approaches, while its detail of specification is inconsistent with any generalities which might be otherwise implied from the terms used in conferring jurisdiction upon this court to enforce these rights.

If jurisdiction had been conferred on this court to prescribe the terms and conditions upon which the railway companies should enjoy the use of the bridge in case the parties should fail to agree, and the charter of the bridge company had been silent upon the subject, there would have been no room to doubt what congress intended. But when the act defines in detail the extent and character of the use to which the railway companies are privileged, by language which limits the easement to an equality in the facilities for using the bridge, and then authorizes the court to prescribe the terms and conditions under and upon which this easement shall be protected, it would seem to be an unwarrantable stretch of construction to hold that thereby the court is authorized to prescribe terms and conditions which will secure the railway companies a far more important and extensive easement.

But when it is sought to confer on a judicial tribunal a power so unusual, and invest it with discretion to adjudge what shall be the value of franchises granted to a corporation by the legislatures of sovereign states; and when it is apparent that the existence of such a power would discourage if not wholly deter capitalists from investing their money in an enterprise involving a large outlay and exceptional hazards, and thus defeat the object which the act was intended to sanction,—it would be repugnant to common sense to expect to find this power conferred in vague and uncertain terms, or by language which would leave the legislative intent obscure.

It might well happen that differences would arise between the bridge company and the several railway companies in the adjustment of the details for regulating the use of the bridge, its machinery, and approaches,—difference as to precedence, time, and amount of use by the several companies; differences in the measure of equality meted out,—when a resort to the court might be expedient to determine what terms and conditions would secure complete equality between the parties; and it is reasonable to suppose that contingency was anticipated by congress and designed to be met by the grant of jurisdiction to this court. Such is the interpretation that must now prevail.

It is much to be regretted that the parties have been subjected to the burden of litigating the whole controversy presented by the pleadings, when, if the view which is now entertained had prevailed earlier in the progress of the case, that burden would not have been imposed. It may, however, afford them some slight satisfaction to know that the court has also been subjected to no inconsiderable labor in considering the testimony and reaching conclusions upon the whole controversy; and that it was not until these conclusions were being formally stated, in order that the parties might know the reasons which led to them, that the court became convinced that the true interpretation of the act of congress had been misconceived.

As the only controversy between the parties relates to the compensation which shall be paid by the petitioner, the case is not presented to which the jurisdiction conferred by the act of congress attaches.

The petition is dismissed with costs.